Alison E. Chase SBN (226976)
achase@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Gretchen Freeman Cappio (*pro hac vice* forthcoming)
gcappio@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900, Fax (206) 623-3384

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| KATHLEEN O'NEILL, on behalf of herself and all others similarly situated, | No. 2:20-cv-06218 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| CARNIVAL CORPORATION & PLC; PRINCESS CRUISE LINES LTD | **JURY TRIAL DEMAND** |
| Defendants. | |

## I.    INTRODUCTION

1.    When the Coral Princess cruise ship departed from Valparaiso, Chile on March 5, 2020, the novel coronavirus was spreading rapidly across the globe. Given the close, mobile quarters occupied by cruise travelers from many different locations, the cruise industry was especially affected by the rapid spread of the virus. Particularly aware

1

of these dangers was the Carnival Cruise line family of companies—the world's largest cruise line—which includes Princess Cruises, Holland America Line, Costa Cruises, and more.

2.      Indeed, on the very same day that the Coral Princess departed port, another Princess cruise ship, the Grand Princess, announced a ship-wide quarantine. But Carnival and its family of companies was well aware of the danger posed by the novel coronavirus even before the Grand Princess quarantine, as there had already been a massive outbreak aboard their Diamond Princess cruise ship the month prior.

3.      Notwithstanding its knowledge of the dangers presented by cruising in the midst of a pandemic, Carnival and its family of cruise lines continued to sail, putting tens of thousands of passengers and employees in danger, to say nothing of the general public. As the Wall Street Journal reported, "[e]arly in March, the world's cruise-ship operators had ample evidence to believe their fleet of luxury liners were incubators for the new coronavirus. Yet they continued to fill cruise ships with passengers, endangering those aboard and helping spread COVID-19 to the U.S. and around the globe[.]"[1]

4.      Therefore, Plaintiff Kathleen O'Neill, a passenger aboard the Coral Princess, brings this action on behalf of herself and others similarly situated, against Princess Cruise Lines Ltd. ("Princess") and its parent companies Carnival Corporation & Carnival plc (collectively "Carnival").

---

[1] Jacquie McNish et al., *Cruise Ships Set Sail Knowing the Deadly Risk to Passengers and Crew*, Wall St. J. (May 1, 2020), https://www.wsj.com/articles/cruise-ships-set-sail-knowing-the-deadly-risk-to-passengers-and-crew-11588346502.

## II.    JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1333(1). This action arises from a maritime tort. Pursuant to 28 U.S.C. § 1333(1), the district courts shall have original jurisdiction over any civil action of maritime or admiralty jurisdiction.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) and (C), the Class Action Fairness Act of 2005 ("CAFA"). Plaintiff O'Neill's claims exceed $5,000,000; she is a citizen of North Carolina; and a citizen of a different state from at least one Defendant.

7.      Further, without conceding the enforceability of the "Passage Contract," Princess is a party to that contract. Pursuant to Paragraph 15(B)(i), the Passage Contract purports to name the Central District of California in Los Angeles as the forum and jurisdiction for legal actions such as this and Defendants have thereby consented to personal jurisdiction in this District.

8.      This Court has personal jurisdiction over each of the Defendants. The headquarters of Princess are located within this District, in Santa Clarita, California. Princess conducts substantial business within the Central District of California. Carnival is authorized to do business in California and conducts substantial business within the Central District of California, including but not limited to through its wholly-owned subsidiary Princess. Upon information and belief, Princess and Carnival market cruises and other vacation-related services to California residents. Many of the activities giving

3

rise to this Complaint took place in California and the claims arise from Defendants' contacts with California.

### III.   THE PARTIES

9.      Plaintiff Kathleen O'Neill is *sui juris*, and is a resident of Oak Island, North Carolina in Brunswick County and was a passenger aboard the Coral Princess cruise ship departing Valparaíso, Chile on March 5, 2020.

10.     Defendant Carnival Corporation was incorporated in 1972 in Panama and has its headquarters in Miami, Florida.

11.     Defendant Carnival plc was incorporated in 2000 in Wales, United Kingdom. It also has its headquarters in Miami, Florida.

12.     Defendants Carnival Corporation and Carnival plc operate as a single economic entity. As Carnival Corporation & Carnival plc state on the "Investor Relations" portion of their collectively-maintained website, "Carnival Corporation and Carnival plc operate a dual listed company, whereby the businesses of Carnival Corporation and Carnival plc are combined and they function as a single economic entity through contractual agreements between separate legal entities."[2] Carnival Corporation and Carnival plc stated, in their Strategic Report and IFRS Financial Statements for the year ended November 30, 2019, that "[t]he two companies operate as if they are a single

---

[2] *Investor Relations*, Carnival Corporation & plc, https://www.carnivalcorp.com/investor-relations (last visited July 2, 2020).

4

economic enterprise with a single senior executive management team and identical

Boards of Directors[.]"[3]

13.     Shareholders of Carnival Corporation and Carnival plc "operate as a single

economic enterprise" and "vote as a single body."[4] As noted above, Carnival Corporation

and Carnival plc share the same Board of Directors;[5] the companies also share the same

headquarters[6] and consolidated financial statements.[7] Carnival Corporation and Carnival

plc are therefore referred to collectively herein as "Carnival."

14.     Defendant Princess Cruise Lines Ltd. is a wholly-owned subsidiary of

Carnival, incorporated in Bermuda, with its worldwide headquarters located in Santa

Clarita, California within the County of Los Angeles, California.

15.     Upon information and belief, at all times hereto, Carnival and Princess

advertised, marketed, sold, and profited (directly or indirectly) from and owned,

controlled, and operated the cruise ship Coral Princess.

---

[3] *Carnival plc Strategic Report & IFRS Fin. Statements, Year Ended Nov. 30, 2019* at p.
3, https://www.carnivalcorp.com/static-files/e71dadff-f1f5-4d72-8281-0d0a500f84b2;
*see also Carnival Corporation & plc 2019 Annual Report* at p. 10,
https://www.carnivalcorp.com/static-files/9ba84dfd-b96a-486f-8617-34e49820077a.
[4] *Id.* at p. 10
[5] *Corporate Information – Board of Directors*, Carnival Corporation & plc,
https://www.carnivalcorp.com/corporate-information/board-of-directors (last visited
July 2, 2020).
[6] *Corporate Information*, Carnival Corporation & plc, https://www.carnivalcorp.com/
corporate-information (last visited July 2, 2020).
[7] *See, e.g.*, *Carnival Corporation & plc Form 10-Q for the Quarterly Period Ended Feb.
29, 2020*, https://sec.report/Document/0000815097-20-000030/.

16.    In the "Joint Factual Statement" contained in a 2016 plea agreement, Defendants Carnival and Princess are represented and agreed that:

> Princess is one of several 'operating lines' that together comprise the 'Carnival Group' of companies. Princess and the other cruise ship operating lines are semiautonomous entities within the Carnival Corporation and Carnival plc (formerly P&O Princess Cruises plc) corporate umbrella. Carnival Corporation and Carnival plc ("Carnival Corporation & plc") currently monitors and supervises environmental, safety, security, and regulatory requirements for Princess and other Carnival brands."[8]

17.    In the "Joint Factual Statement" contained in the 2016 plea agreement, Carnival further represented that it had authority to appear on behalf of Princess and was authorized to enter a plea of guilty on its behalf.[9]

18.    Princess shares the same Board of Directors as Carnival, many of the same executive officers and assets, such that its operations and day-to-day business are controlled by Carnival.

19.    Defendants Carnival and Princess are therefore agents of each other with respect to the factual matters alleged herein, and further act as alter egos of each other such that the corporate form should be disregarded.

---

[8] Joint Factual Statement at p. 1, *United States v. Princess Cruise Lines, Ltd.*, No. 16-CR-20897-PAS (S.D. Fla. Dec. 1, 2016), ECF No. 2-1.

[9] Plea Agreement at p. 1, *United States v. Princess Cruise Lines, Ltd.*, No. 16-CR-20897-PAS (S.D. Fla. Dec. 1, 2016), ECF No. 2.

## IV.    FACTUAL ALLEGATIONS

**A.    COVID-19 and the Danger of Viral Spread in Close Quarters**

20.    In or around December 2019, a new strain of coronavirus was first detected in humans in Wuhan, China (the original COVID-19 epicenter).

21.    SARS-CoV-2, commonly known as COVID-19, is an extremely contagious disease caused by the novel coronavirus. Symptoms associated with COVID-19 include fever, a dry cough, shortness of breath, infection, and pneumonia.

22.    COVID-19 can be fatal. The elderly and/or immunocompromised are particularly vulnerable to severe cases of COVID-19. It is important to note that cruise lines' most loyal and valuable passengers are often situated within this high-risk category.

23.    As of filing this complaint, there have been nearly 13 million confirmed COVID-19 cases worldwide and over 570,000 global COVID-19 related deaths. In the United States, the infection count stands at over 3,300,000 confirmed COVID-19 cases and over 137,000 COVID-19-related deaths. The numbers of confirmed cases and death likely undercount the true number of cases and number of deaths caused by COVID-19.

24.    On January 30, 2020, the World Health Organization ("WHO") convened the IHR Emergency Committee, declaring COVID-19 a global public health emergency.[10] In the WHO's "Situation Report" released on the same day, the

---

[10] *Timeline of WHO's Response to COVID-19*, WHO (last updated June 30, 2020), https://www.who.int/news-room/detail/29-06-2020-covidtimeline.

7

organization confirmed 7,736 total cases in China and 82 confirmed cases in 18 countries outside China, acknowledging a high rate of spread through person-to-person contact.[11] The organization determined a risk assessment as "[v]ery [h]igh" for China and "[h]igh" at a global level.[12]

25.    The severity and rate of spread for the novel coronavirus was known as early as January 2020. Although the impact of the novel coronavirus was mild for most of the United States in the months of January and February, it was well established from data in China and other early hotspots that the virus was highly contagious and spread rapidly in close quarters through person-to-person contact.

26.    Due to the nature of COVID-19 and its ability to spread in close quarters, cruise ships are inherently prone to outbreaks. Indeed, cruise ships have always been vulnerable to the spread disease and infection due to the nature of crowded enclosed and semi-enclosed areas, the increased exposure to new environments, and limited medical resources.[13] In short, prior to the appearance of COVID-19, the substantial risk of disease transmission on cruise ships was well known.

---

[11] *Novel Coronavirus (2019-nCov) Situation Report – 10* at p. 1, WHO (Jan. 30, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200130-sitrep-10-ncov.pdf?sfvrsn=d0b2e480_2.

[12] *Id.*

[13] Kara Tardivel et al., *Cruise Ship Travel,* Ctrs. for Disease Control & Prevention, https://wwwnc.cdc.gov/travel/yellowbook/2020/travel-by-air-land-sea/cruise-ship-travel (last visited July 2, 2020).

27.     On January 27, 2020, experts in the European Union released their first version of guidelines to assist with the probable impact of COVID-19 on cruise ships.[14] The guidelines urged cruise companies to provide pre-travel information about the risks of COVID-19. In the event of a COVID-19 case aboard a cruise, the guidelines recommended close contacts of the case should be quarantined in their cabins or on shore, and "casual contacts" should be disembarked with active tracing and surveillance.

28.     In early February 2020, Dr. Anthony S. Fauci, the United States top infectious disease expert declared his concern for passengers and crew traveling on cruise ships: "People on a large ship, all together, at the same time, all the time — you couldn't ask for a better incubator for infection."[15]

**B.     Defendants Knew of the Dangers Posed by Cruises in the Shadow of COVID-19**

29.     Outlined below is a timeline of events relevant to this action, focusing on the highly publicized outbreaks aboard the Diamond Princess and Grand Princess, with most events predating the Coral Princess voyage departure on March 5, 2020. As shown through this timeline, Defendants had knowledge of the dangerous health and safety risks associated with COVID-19 and the risk of it spreading within the confined quarters of a

---

[14] *Advice for Ship Operators for Preparedness and Response to the Outbreak of Novel Coronavirus (2019-nCoV) Infection*, Healthy Gateways (Jan. 27, 2020), https://www.deutsche-flagge.de/de/redaktion/dokumente/dokumente-sonstige/3_eu_healthy_gateways_wuhan_outbreak_advice_maritime_27-1-2020-1.pdf.

[15] David Leonhardt, *Why Did Cruise Ships Keep Sailing?*, N.Y. Times (Apr. 27, 2020), https://www.nytimes.com/2020/04/27/opinion/coronavirus-cruise-celebrity-eclipse.html.

cruise ship. By the time the Coral Princess left the port of Valparaíso on March 5, 2020, the deadly progression of a COVID-19 spread aboard a cruise vessel was clearly established.

30.     In early February 2020, one of the first outbreaks of COVID-19 to capture global attention happened on the Diamond Princess, a cruise ship owned by Carnival Corporation and Carnival plc and operated by Princess Cruise Lines. The outbreak originated while docked in Yokohama, Japan. Aboard the Diamond Princess were 2,666 passengers and 1,045 crew members from a combined 56 countries.

31.     On February 1, 2020, Hong Kong's government confirmed that an 80-year-old male passenger who had disembarked the Diamond Princess on January 25 tested positive for COVID-19.[16] Although the first Diamond Princess passenger was diagnosed February 1, Defendants did not alert, warn, or announce anything on board the vessel until February 3, nearly 48 hours later.[17]

32.     After receiving a clear warning sent by an epidemiologist from the government of Hong Kong, seemingly nothing was done aboard the ship.[18] The ship did

---

[16] Eisuke Nakazawa et al., *Chronology of COVID-19 Cases on the Diamond Princess Cruise Ship and Ethical Considerations: A Report from Japan* at p. 1, Disaster Med. & Pub. Health Preparedness (Mar. 24, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7156812/.

[17] Matt Apuzzo et al., *Failures on the Diamond Princess Shadow Another Cruise Ship Outbreak*, N.Y. Times (last updated Mar. 10, 2020), https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html.

[18] Doug Bock Clark, *Inside the Nightmare Voyage of the Diamond Princess*, GQ (Apr. 30, 2020), https://www.gq.com/story/inside-diamond-princess-cruise-ship-nightmare-voyage?utm_source=onsite-share&utm_medium=email&utm_campaign=onsite-share&utm_brand=gq.

not establish quarantine, instead waiting until Japanese Officials took the action the cruise itself failed to, ordering quarantine on February 5. Ten more positive COVID-19 cases were confirmed around February 5, 2020.

33.    Within days, that number escalated to 66 new cases. Then 66 became over 700 cases with 14 deaths.[19] Of these infections and deaths, at least two of the deaths occurred before February 19, 2020,[20] and a total of 691 cases of the COVID-19 had been confirmed on the Diamond Princess as of February 23, 2020.[21]

34.    As thousands of passengers aboard the Diamond Princess found themselves confined to their small cabin rooms and crew members were required to step into a role they were never trained for, days passed, and passengers grew understandably restless. Some even hung banners off the side of the ship, crafted out of cabin bedsheets and painted with pleas for help. One read: "Serious lack of medicine, lack of information."[22]

35.    Many crew members and staff aboard the Diamond Princess were rightfully scared for their lives. It was reported that food service workers would "deliver[] food and then run[] back to their cabins to jump into scalding showers or wash their hands in hot water until they hurt."[23] "Later, a report released by the Centers for Disease Control and

---

[19] Lauren Smiley, *27 Days in Tokyo Bay: What Happened on the Diamond Princess*, Wired (Apr. 30, 2020), https://www.wired.com/story/diamond-princess-coronavirus-covid-19-tokyo-bay/.

[20] *Japan Reports Two Deaths Among Cruise Ship Passengers*, N.Y. Times (last updated Mar. 12, 2020), https://www.nytimes.com/2020/02/19/world/asia/china-coronavirus.html.

[21] Nakazawa et al., *supra*, note 16.

[22] Clark, *supra*, note 18.

[23] *Id.*

Prevention ("CDC") validated this fear, noting that in the early stages of the outbreak three-fourths of all the infected crew members were food service workers—employees who could easily spread the disease to other crew and passengers."[24]

36.     In reference to the Diamond Princess, Eva Lee, an infectious disease specialist at the Georgia Institute of Technology, sent an email to health experts investigating the rate of spread, calling the quarantine process on the ship a "quarantine nightmare with missing opportunities and missteps."[25]

37.     The disembarkation process was a chaotic disaster. Passengers aboard the Diamond Princess report that they "spent three hours idling on the pier and then, once they drove to the airport, sat on the tarmac for two more hours. Now, as the delay extended into a sixth hour, the passengers were nearing revolt. They were exhausted. And more problematically for the largely elderly passengers: The buses had no bathrooms."[26]

38.     With Diamond Princess being one of the first cruise ships to experience a severe COVID-19 outbreak, Carnival and Princess confronted a new situation in seeking to control the infection. But the risk of infection through person-to-person contact was well known by early February and Defendants knew, by that time, the potential for a negative outcome of a slowed response with no precautionary measures in place. It was not only about combating the spread of COVID-19 on the Diamond Princess, but also the

---

[24] *Id.*
[25] Smiley, *supra*, note 19.
[26] Clark, *supra*, note 18.

12

possibility of a spread on subsequent voyages. The Diamond Princess became Defendants' early model, but they failed to learn and move forward properly.

39.     The consequences of Defendants' failure to take appropriate action and to learn from the Diamond Princess manifested quickly. Another highly publicized outbreak aboard the Grand Princess, also owned by Carnival Corporation and Carnival plc and operated by Princess Cruise Lines, demonstrates another problematic outbreak on board due to a lack of necessary precautionary measures. New and stringent policies and procedures should have been employed, especially in light of the Diamond Princess disaster. But Defendants failed to take appropriate action, thus putting another set of thousands of passengers at risk to contract the deadly coronavirus on back to back voyages.

40.     In late February, Dr. Grant Tarling, the Group Senior Vice President and Chief Medical Officer for Carnival and its subsidiary Princess, reported in a videotaped message on the company's website that its ships would take temperatures of all boarding guests, give out hand sanitizer, and closely check passports.[27] Outlined below, on the Grand Princess voyage, shows how such precautions against the spread of COVID-19 were never implemented.[28]

---

[27] "Dr. Grant Tarling Medical Update with Enhanced Screening and Preventive Health Measures" (February 2, 2020), https://www.youtube.com/watch?v=kSOuXwmh9Lo
[28] Jacquie McNish et al., *Cruise Ships Set Sail Knowing the Deadly Risk to Passengers and Crew*, Wall. St. J. (May 1, 2020), https://www.wsj.com/articles/cruise-ships-set-sail-knowing-the-deadly-risk-to-passengers-and-crew-11588346502.

41.     On February 11, 2020, Carnival and Princess operated a "10-Night Mexican Riviera" roundtrip voyage from San Francisco to Mexico aboard the Grand Princess. On or around February 19, 2020, it was known that at least one passenger on this voyage was suffering from COVID-19 symptoms. This passenger, a man from Placer County, California, was hospitalized for persistent and severe symptoms. He later died on March 4, 2020, a day before the Coral Princess set sail.[29]

42.     Regardless, the Grand Princess ultimately proceeded with the next scheduled trip with no extra precautions taken. The Grand Princess returned to the Port of San Francisco on February 21, 2020. Most passengers on the "10-night Mexican Riviera" voyage disembarked, though some remained onboard to travel on the ship's subsequent trip to Hawaii.

43.     No medical screenings or examination procedures were put in place despite the fact that a passenger on the prior Grand Princess voyage had sought medical treatment on board for "acute respiratory symptoms," ultimately determined to be COVID-19. Additionally, there were no stringent sanitization or disinfecting measures utilized on the vessel between the Mexico and Hawaii voyages. Instead, after the passenger being treated for COVID-19 left the ship, rather than disinfect or sanitize or even advise the remaining passengers to take extra care, Defendants invited new passengers to fill the remaining spots the others had just left open.

---

[29] *Id.*

44.    Passengers boarding the Grand Princess headed onward to Hawaii were not notified of a likely COVID-19 case or made aware that there were passengers and crew from the previous leg to Mexico who may have been exposed or infected and that crew (as well as some passengers) remained onboard for the onward journey to Hawaii.

45.    It was not until February 25, 2020 that Carnival and Princess emailed passengers that had traveled on the Grand Princess trip to Mexico alerting them that some of their fellow passengers had suffered from COVID-19 symptoms and that they may have been exposed.

46.    After passengers on the Mexico trip reported symptoms aligned with COVID-19 around mid- to late February, it was finally confirmed, although expected, on March 2, 2020 that a man from the Mexico cruise tested positive for COVID-19.[30]

47.    A health advisory was finally put into place on the Grand Princess on March 4, 2020. The Grand Princess had decided to turn back to the Port of San Francisco. Further, the advisory alerted passengers to the investigation of a "small cluster of COVID-19 (coronavirus) cases in Northern California connected to"[31] the Grand Princess Mexico trip, and informed passengers of their potential exposure to the virus.[32]

48.    The March 4 health advisory, signed by Dr. Grant Tarling, also suggested that passengers traveling on the Hawaii trip had already reported suffering from COVID-

---

[30] *Id.*

[31] Dr. Grant Tarling, *Guest Health Advisory – Coronavirus*, Princess (Mar. 4, 2020), https://www.princess.com/news/notices_and_advisories/notices/grand-princess-updates.html.

[32] *Id.*

19 symptoms, and instructed other passengers who were experiencing or had at any time during the trip experienced symptoms "of acute respiratory illness with fever chills or cough" to immediately contact the ship's Medical Center.[33]

49.     Spurred by the COVID-19 outbreak on the Grand Princess and concern for general public health, California Governor Gavin Newsom declared a State of Emergency on March 4, 2020 to manage the spread in California.[34] The State of California refused to allow the Grand Princess into the port of San Francisco, forcing the ship to anchor off the coast. Governor Newsom stated at a press conference that there were 11 passengers and 10 crew members experiencing symptoms.[35]

50.     Finally, the Grand Princess was able to pull into port on March 9 in Oakland, California, where the CDC mostly took over. Like those aboard the Diamond Princess, the passengers endured an additional 14-day quarantine after disembarking before being allowed to travel home.

---

[33] *Id.*

[34] *Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19*, CA.gov (Mar. 4, 2020), https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/.

[35] Victoria Colliver, *California Declares Coronavirus State of Emergency, Orders SF-Bound Cruise Ship to Remain in the Pacific*, Politico (March 4, 2020), https://www.politico.com/states/california/story/2020/03/04/california-declares-coronavirus-state-of-emergency-orders-sf-bound-cruise-ship-to-remain-in-pacific-1265473

51.     "Ultimately, more than 130 people aboard the Grand Princess tested positive, and at least six have died, including five passengers and one crew member[.]"[36]

52.     Overall, Carnival ships at sea have become virus hot spots, "resulting in more than 1,500 positive infections and at least 39 fatalities."[37] According to many health experts, the decision to keep sailing for weeks after the coronavirus was detected in early February contributed to the mounting toll of cases.[38]

53.     It has been reported that seven ships owned by Carnival accounted for 49 of the roughly 70 deaths of passengers and crew with COVID-19 on vessels that began voyages or boarded new passengers in the first two weeks of March.[39]

## C.     Defendants Failed to Take Appropriate Actions

54.     The timeline of events occurring on the Diamond Princess and Grand Princess demonstrate Defendants' knowledge of the severity of COVID-19 and how it could spread quickly and fatally. By allowing the Coral Princess to depart on March 5, 2020, the Defendants ignored all warnings that vessels continuing to sail would likely face the same fate. Defendants' decision to sail the Coral Princess with no precautions or extra sanitization measures in place after the outbreak onboard the Diamond Princess and

---

[36] Rosalind S. Helderman et al., *The Pandemic at Sea*, Wall St. J. (Apr. 25, 2020), https://www.washingtonpost.com/graphics/2020/politics/cruise-ships-coronavirus/.

[37] Austin Carr & Chris Palmeri, *Socially Distance This: Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going*, Bloomberg (Apr. 16, 2020), https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/.

[38] Helderman et al., *supra*, note 33.

[39] McNish et al., *supra*, note 27.

Grand Princess shows the failure of the Defendants to take appropriate action, thus unnecessarily risking the health and safety of all passengers and crew on both vessels.

55.    A study conducted by the Journal of Travel Medicine, modeling the Diamond Princess epidemic, reached some sobering conclusions about the danger of COVID-19 in close quarters and how the quarantine was mishandled.[40]

56.    The rate of infection aboard the Diamond Princess quadrupled that of Wuhan, China. Revealing that if it was left unchecked, the disease would have eventually touched 79% of those on board, or 2,900 people.[41] With the eventual intervention, the outbreak on the Diamond Princess never hit those numbers. However, researchers revealed that if all passengers had been properly and safely evacuated from the Diamond Princess when COVID-19 was discovered, the outbreak could have been contained to 2%, or 76 people.[42]

57.    Overall, the approach to quarantine procedures across many vessels struggled to properly maintain the outbreak, even with the Diamond Princess as an example. The study ultimately concluded that the key factor for heightened spread: the ship itself.[43] Essentially, it is a "floating petri dish" where "you've got passengers and crew members from different parts of the world mixing intimately and intensely for a

---

[40] J. Rocklöv et al., *COVID-19 Outbreak on the Diamond Princess Cruise Ship: Estimating the Epidemic Potential and Effectiveness of Public Health Countermeasures*, J. Travel Med. (Feb. 28, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7107563/pdf/taaa030.pdf.
[41] *Id.*
[42] *Id.*
[43] *Id.*

short period of time", says Dr. Sanjaya Senanayake, an infectious diseases specialist at the Australian National University. [44]

58.     Combine a space already vulnerable to the spread of infection with a novel, highly contagious virus, and no stringent precautions in place, and the result jeopardized the health and safety of thousands of passengers and crew time and again across multiple vessels and voyages. The slow response and refusal to acknowledge initial warnings facilitated the early spread of the COVID-19 virus across cruise vessels and the world.

59.     After the initial outbreak on the Diamond Princess, precautions, warnings, and sanitization measures were never enforced on the Grand Princess, the Coral Princess, or other subsequent voyages until it was too late.

60.     Even more, the Coral Princess should have never set sail on March 5, 2020. Aboard the Grand Princess, which sailed after the first known outbreak on the Diamond Princess, passengers reported that the crew took no rigorous approach to coronavirus screening. There were no temperature checks performed before boarding and no individual questioning. The crew sent out a mass questionnaire with no follow up procedures in place. Line dancing, tai chi, bars, restaurants, and buffets still proceeded on the Grand Princess as normal, even with knowledge of confirmed and possible COVID-19 cases. Even after passengers were informed of the possible COVID-19 concern by

---

[44] Yvette Tan, *Coronavirus: Are Cruise Ships Really 'Floating Petri Dishes'?* (February 12, 2020), https://www.bbc.com/news/world-asia-51470603

loudspeaker announcement, passengers were still permitted to don formal attire for an evening meal featuring lobster tail.[45]

61.     Events were still held despite knowledge of COVID-19 outbreaks on various vessels and the danger associated with its spread in close quarters. A quarantine on the Grand Princess for passengers was not enforced until about March 5, 2020, an entire month after the Diamond Princess diagnosed its first cluster of COVID-19 positive passengers. Until then, everyone was vacationing and having a good time with activities continuing as relativity normal.

62.     The events reported by passengers aboard the Grand Princess, an earlier voyage than the Coral Princess, demonstrate the Defendants' failure to take appropriate actions. Unfortunately, the Coral Princess experience paralleled that of the Grand Princess, despite a later departure date and timeline.

63.     Even though Carnival Corporation had ample information at its fingertips regarding the danger of continuing business as usual, it did not suspend operations until all other members in Cruise Lines International Association ("CLIA") also suspended operations. Only after the WHO officially and publicly declared a pandemic in mid-March did CLIA members suspend operations.

---

[45] Letitia Stein et al., *Diamond Princess, Grand Princess Cruise Line Had High Rates of Illness Even Before Coronavirus*, USA Today (last updated Mar. 22, 2020), https://www.usatoday.com/story/news/investigations/2020/03/20/before-coronavirus-princess-cruises-saw-outbreaks-alarming-rates/5047508002/.

20

**D.     Passengers' and Plaintiff's Experience Aboard the Coral Princess**

64.     The Coral Princess, also owned by Carnival Corporation and Carnival plc and operated by Prince Cruise Lines, departed March 5, 2020, despite previous voyages that experienced early outbreaks.

65.     Similar to the Diamond Princess and Grand Princess, passengers aboard the Coral Princess vessel reported that people were still able to attend films on deck, tai chi classes, and dancing sessions, even as the virus spread on the ship. Even as port after port turned the ship away due to the virus, the party went on.

66.     On March 20, a letter from a senior physician assured passengers that the risk of the ship's exposure was "near negligible."[46] In the letter obtained by the Washington Post, Defendants told passengers that: "Rest assured that, relatively speaking, Coral Princess is probably one of the safest places in the world to be at this time."[47]

67.     Plaintiff O'Neill quickly discovered the vessel was far from safe—instead it was a health risk and a nightmare.

68.     Plaintiff O'Neill departed on the Coral Princess on March 5, 2020 with her husband of over 35 years, Mr. John Hutton. They were scheduled to return home on March 22, 2020 with a few days to settle in and prepare for Mr. Hutton's neurosurgery on March 25. Little did they know, their last landfall would be on March 13 they would

---

[46] Helderman et al., *supra*, note 33.
[47] *Id.*

instead spend almost three additional weeks trapped in a cabin on the infested vessel.

They would not return home until April 8, 2020, over two weeks later than planned.

### Intended Itinerary of Plaintiff's
### Trip with the Coral Princess



69.     The cruise went along as normal for Plaintiff O'Neill and her husband until about March 14th when the captain announced that they would not be porting in Puerto Madryn, Argentina as scheduled on March 15th with no announcement of illness.

70.     The vessel departed from its itinerary, seeking a port that would allow it entry. The Coral Princess proceeded to Buenos Aires. Plaintiff O'Neill and her husband purchased two separate sets of airlines tickets from Buenos Aires, hoping to disembark the Coral Princess and return home. They were not allowed to return home.

71.     The Coral Princess then proceeded to Montevideo, Uruguay. Again, Plaintiff O'Neill and her husband purchased airlines tickets hoping to disembark the Coral Princess and return home. Again, they were not allowed to return home. Montevideo too closed off the port to the Coral Princess.

72.     The long haul at sea continued. Encountering closed port after closed ports the Coral Princess arrived in Rio de Janeiro. Again, Plaintiff O'Neill and her husband purchased airlines tickets hoping to disembark the Coral Princess and return home. Again, they were again not allowed to disembark and go to the airport.

73.     On March 26, Plaintiff O'Neill visited the ship's doctor for shoulder pain. Noticeably, the ship's nurse was stressed. Unbeknownst to Plaintiff O'Neill, many people were extremely ill in sick bay. The ship did not announce the spread of illness until four days after Plaintiff O'Neill visited the doctor. For those four days, passengers were kept ignorant of the dire situation, instead encouraged to continue their cruising life as normal, exercising, relaxing, eating, drinking, and dancing communally.

74.     It was not until March 31 that anything changed. The Captain announced simply, "All passengers please return to your cabins." Later that day, they were told that that dinner would be brought to the cabins and "an unusually high number of people" were experiencing flu-like symptoms. It was then, after everyone had been socializing and making purchases for about 26 days in an environment known to be susceptible to contagion that the passengers were advised to take these precautions.

75.     Passengers remained in their cabins for the duration of the cruise. Plaintiff O'Neill and her husband's cabin was 21 paces from end to end.

76.     Five days passed, and there were only three announcements, including: "More people have reported to sick bay with flu like symptoms. We are sorry to say that

23

two passengers have passed away." Passengers received no information about disembarkation status, testing availability, or next steps.

77.    While confined in their cabin, Plaintiff O'Neill and her husband watched ambulances drive up to the medical deck located right below them. They saw the morgue come and they saw countless crew members and fellow passengers being rushed off on gurneys at all hours of the day.

78.    While docked in Miami with no answers from crew about disembarkation, Plaintiff O'Neill became desperate. She wrote "TEST ME" on a spare piece of paper, ultimately drawing media attention to their dire situation. Simply, Plaintiff O'Neill wanted some answers to how her and her husband would be able to get back home safely.



79.    While on board, Plaintiff O'Neill developed a cough, her throat became scratchy, and she began to feel feverish. She called to guest services to request a thermometer, but was told they did not have any. She then requested Tylenol which guest services provided at a cost of $3.99. Plaintiff O'Neill also submitted requests for her

husband's blood pressure medication to both guest services and medical services, but they went unanswered.

80.     Finally, on Tuesday, April 6, Plaintiff O'Neill and her husband were allowed to disembark. After taking a chartered flight, they arrived home around midnight. On Wednesday, April 8, they began their 14-day home quarantine. With access to a thermometer, they began temperature monitoring, and on April 9 they went to their closest drive through testing center, gloved and masked.

**Timeline of O'Neill's Experience**



81.     On Friday, April 10, Brunswick County Health Services issued results to Plaintiff O'Neill and her husband. Plaintiff O'Neill tested positive and her husband tested negative for COVID-19.

82.     Plaintiff O'Neill had to isolate herself in a room located at the far end of her house. She experienced dry cough, a 102-degree fever, chills, a sore throat, and more. For 14 days, she stayed confined in her room, away from her husband, who was awaiting a rescheduled neurosurgery, and her cat. Her husband's mobility remained impaired, but he

used a cane to bring her meals, leaving them outside her door. Plaintiff O'Neill spent her time isolated in fear for her life.

83.     On April 22, the health department informed Plaintiff O'Neill that she was no longer at risk for transmitting COVID-19. The next day, Plaintiff O'Neill and her husband contracted a company to deep clean, disinfect their home, and treat the HVAC system in preparation for her husband's surgery.

84.     Despite the health department's clearance, Plaintiff O'Neill continued to be affected and limited by her prior diagnosis. She was denied treatment for her shoulder by an orthopedist due to her once positive COVID-19 diagnosis.

85.     Defendants put Plaintiff and the Class in actual physical danger of contracting a deadly virus, kept that information from them as long as they could, and then forced them into the only option that remained at that point—staying trapped in a 21-pace room for weeks on end. Instead of a first-hand look at South American ports, Plaintiff and the Class got a first-hand look at ambulance and morgue workers carting gurneys off the ship they were trapped on for weeks.

86.     The following map summarizes the difference between the itinerary purchased by Plaintiff and the nightmare voyage as it actually unfolded:

Planned Itinerary (Completed)
Planned Itinerary (Uncompleted)
Revised Itinerary (Uncompleted)
Actual Itinerary (Completed)

## V. NOTICE AND CLASS ACTION WAIVER

87.     Upon the basis of counsel's investigation, Plaintiff is informed that Princess maintains a "Passage Contract," on its website, purporting it to apply "to most voyages except select itineraries departing from Australia, Japan, Singapore, China, and Korea." Plaintiff. Paragraph 15(A)(i), the Passage Contract purports to require, *inter alia*, "In cases involving claims for Emotional Harm, bodily injury, illness to or death of any Guest, no lawsuit may be brought against Carrier unless (1) written notice giving full particulars of the claim is delivered to Carrier within 6 months from the date of the Emotional Harm, bodily injury, illness or death…". Without conceding the enforceability of the Passage Contract, Plaintiff provided notice to Defendants of her claim on July 7, 2020.

27

88.     Plaintiff does not concede, and specifically disputes, the enforceability of the Passage Contract and each of its provisions. Among other things, the Passage Contract, paragraph 15(c), purports to contain a provision entitled, "WAIVER OF CLASS ACTION".

89.     The "WAIVER OF CLASS ACTION" provision in the Passage Contract is void, null, unenforceable and without effect. The "WAIVER OF CLASS ACTION" provision was not reasonably communicated to Plaintiff O'Neill. Plaintiff O'Neill did not have the opportunity or ability to become meaningfully informed of the clause and to reject its terms.

## VI.    CLASS ACTION ALLEGATIONS

90.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff brings this action on her behalf and on behalf of all others similarly situated. The proposed class that Ms. O'Neill seeks to represent is defined at this time as: All persons in the United States who were passengers aboard the Coral Princess for the voyage departing from Valparaíso, Chile on March 5, 2020.

91.     Excluded from the Class are Princess and Carnival's officers, directors, and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff. Plaintiff reserves the right to amend the Class definition based on information obtained in discovery.

92.     This action satisfies the requirements of numerosity, commonality, typicality, adequacy, predominance and/or superiority requirements.

93.   **Numerosity**: The members of the Class are so numerous that joinder of all members would be impractical. Upon information and belief, the Coral Princess has a capacity in excess of 1,900 passengers and held in excess of 1,500 passengers at the times of its departure on March 5, 2020 from Valparaiso, Chile. The precise number of class members can be ascertained through discovery, which will include Princess and Carnival's records. The members of the class are readily identifiable from information in the possession, custody, and control of Princess and/or Carnival. The individual joinder of all passengers would be impractical such that a class action is more practical and efficient.

94.   **Commonality and Predominance**: Common questions of law and fact predominate over any questions affecting only individual members of the Class. For Plaintiff and the proposed Class, common legal and factual questions include, but are not limited to the following:

a.   Defendants' knowledge of the risks associated with the novel coronavirus and COVID-19, when Defendants became aware of the risks of the coronavirus and COVID-19, and Defendants' decision-making process with respect to the risks associated with coronavirus and COVID-19;

b.   Defendants' knowledge of the risk of the spread of a contagion aboard a cruise ship, including Defendants' past experience with the spread of contagion aboard a cruise ship;

c.  Whether Defendants took sufficient precautions in deciding to sail the Coral Princess on March 5, 2020, in light of their knowledge of the novel coronavirus and/or COVID-19 and the risk of contagion;

d.  Whether Defendants should have canceled the voyage of the Coral Princess departing on March 5, 2020 to avoid exposing passengers to novel coronavirus and/or COVID-19 and in light of the risk of contagion;

e.  Whether Defendants timely and adequately warned prospective passengers and/or passengers aboard the Coral Princess voyage departing on March 5, 2020 of the novel coronavirus, COVID-19, and the associated risk of contagion;

f.  Whether Defendants had a duty to disclose to prospective passengers and/or passengers aboard the Coral Princess voyage departing on March 5, 2020 of the novel coronavirus, COVID-19, and the associated risk of contagion;

g.  Whether the risk of contagion constituted a material fact that reasonable passengers/consumers would have considered in deciding whether to take the Coral Princess voyage on March 5, 2020;

h.  Whether Defendants knew or should have known that crew aboard the Coral Princess were potential carriers of the novel coronavirus;

i.  Whether Defendants had a duty to decontaminate the Coral Princess prior to the initiation of the March 5, 2020 voyage;

j.  Whether Defendants took adequate precautions during the voyage of Coral Princess commencing on March 5, 2020 to prevent the spread of contagion on board the vessel, including with respect to food service, entertainment, quarantine, and the management of the cruise services and decontamination of the vessel during the voyage;

k.  Whether Defendants provided Plaintiffs and the Class with adequate protections, information, and health care during the voyage of Coral Princess commencing on March 5, 2020;

l.  Whether Defendants acted reasonably in the conduct of the Coral Princess voyage departing on March 5, 2020, including with respect to the diversion of the itinerary and efforts to obtain safe passage home for passengers;

m. Interpretation and enforceability of the Passage Contract;

n.  Whether Defendants are the alter egos and/or agents of each other;

o.  Whether Defendants are liable for the conduct alleged in this Complaint;

p.  Whether, because of Defendants' acts and omissions, Plaintiff and the Class have suffered damages; and if so, the appropriate amount thereof; and

q.  Whether Defendants conduct warrants the imposition of punitive

damages.

95.  **Typicality**: Plaintiff's claims are typical of the claims of the members of the

Class. Plaintiff and all the members of the Class were passengers on the Coral Princess

voyage departing on March 5, 2020 and have been injured by the same wrongful

practices of Defendants. Plaintiff's claims arise from the same practices and course of

conduct that give rise to the claims of the members of the Class, the facts of Defendants'

misconduct are common to all class members, and Plaintiff's claims are based on the

same legal theories. Plaintiff and all Class members have been injured by this course of

conduct, suffered significant damage, including emotional distress and economic damage,

and were trapped on board a ship that they would not have sailed on.

96.  **Adequacy**: Plaintiff will fully and adequately assert and protect the interests

of the Class and have retained class counsel who are experienced and qualified in

prosecuting class actions. Neither Plaintiff nor her attorneys have any interests contrary

to or in conflict with the Class.

97.  **Superiority**: A class action is superior to all other available methods of the

fair and efficient adjudication of this lawsuit because individual litigation of the claims of

all members of the Class is economically unfeasible and procedurally impracticable.

98.  While the aggregate damages sustained by the Class are likely to be in the

millions of dollars, the individual damages incurred by each Class member do not

warrant the expense of individual suits. Most Class members would find the cost of

32

litigating their claims prohibitively expensive and would not have a cost-effective remedy at law.

99.    Further, individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

100.    Defendants have access to addresses and/or other contact information for the members of the Class, which may be used to provide notice of the pendency of this action.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Negligence

101.    Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

102.    Plaintiff O'Neill brings this claim on her own behalf and on behalf of each member of the Class described above.

103.    Defendants owed Plaintiff and the Class a duty of reasonable care under the circumstances.

104. Defendants knew or should have known that cruise ships pose a severe and increased risk of viral outbreak. Defendants knew or should have known that cruise ships it owned and operated had already been sites of prior lethal outbreaks of COVID-19.

105. Defendants breached their duty of reasonable care under the circumstances and were negligent in one or more of the following:

    a. Failing to provide reasonable care to provide a safe voyage;

    b. Failing to screen or medically examine any passengers or crew prior to boarding;

    c. Failing to warn passengers of the particular risks of the coronavirus aboard the vessel;

    d. Failing to provide adequate medical supplies and personnel;

    e. Failing to adequately disinfect, clean, or sanitize the vessel;

    f. Failing to implement social distancing protocols before or upon learning passengers were exhibiting symptoms of COVID-19;

    g. Failing to implement adequate measures to contain the spread of COVID-19;

    h. Failing to have an emergency plan to ensure the health and safety of passengers in case of a viral outbreak;

    i. Failing to have an emergency plan to disembark passengers in the case of a viral outbreak; and

j.   Other acts or omissions constituting a breach of the duty of reasonable

care under the circumstances which are revealed through discovery.

106.   As a direct and proximate result of Defendants' breach of their duty,

Plaintiff and the Class suffered harm.

107.   As a direct and proximate result of Defendants' breach of their duty,

Plaintiff O'Neill became infected with COVID-19.

108.   As a direct and proximate result of Defendants' breach of their duty,

Plaintiff O'Neill's husband was without vital medication and thus reliant on a wheelchair

to disembark the vessel, as he could no longer walk.

109.   As a direct and proximate result of Defendants' breach of its duty, Plaintiff

and the Class were exposed to actual risk of physical injury.

110.   As a direct and proximate result of Defendants' breach of their duty,

Plaintiff O'Neill had to contract cleaners to disinfect their house.

111.   As a direct and proximate result of the Defendants' breach of its duty,

Plaintiff and the Class have suffered and continue to suffer severe emotional distress.

After Plaintiff and the Class were trapped for weeks on a vessel teeming with a deadly

virus, they will continue to suffer and require medical services not part of the effects of

daily life. The injuries and damages are permanent or continuing in nature.

112.   As a result, the Plaintiff and the Class are entitled to damages in an amount

to be proven at trial.

## SECOND CAUSE OF ACTION
### Gross Negligence

113.   Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

114.   Plaintiff O'Neill brings this claim on her own behalf and on behalf of each member of the Class described above.

115.   Defendants owed Plaintiff and the Class a duty of reasonable care under the circumstances. Defendants' conduct—operation of a cruise like it was business as usual, rather than a global pandemic in which Defendants' other cruises resulted in the death of passengers—was an extreme departure from reasonable care. Insistence on continuing with the cruise, coupled with failure to provide adequate sanitation, medical care, or emergency plan in the event of what was then a likely outcome demonstrated lack of even scant care.

116.   As a direct and proximate result of Defendants' extreme departure from reasonable care under the circumstances, Plaintiff and the Class were constantly at risk of immediate physical injury or even death.

117.   As a direct and proximate result of Defendants' extreme departure from reasonable care under the circumstances, Plaintiff O'Neill became infected with COVID-19.

118.   As a direct and proximate result of Defendants' extreme departure from reasonable care under the circumstances, Plaintiff and the Class suffered severe emotional distress. After Plaintiff and the Class were trapped for weeks on a vessel

36

teeming with a deadly virus, they will continue to suffer and require medical services not part of the effects of daily life. The injuries and damages are permanent or continuing in nature.

119.   As a result, the Plaintiff and the Class are entitled to damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

120.   Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

121.   Plaintiff O'Neill brings this claim on her own behalf and on behalf of each member of the Class described above.

122.   Due to the negligence and/or gross negligence of the Defendants, Plaintiff and the Class were in the "zone of danger," or at immediate risk of actual physical harm. While trapped for weeks on a vessel teeming with a deadly virus, Plaintiff and the Class were at immediate risk of contracting COVID-19 and subsequently suffering its related symptoms such as coughing, aches, fever, difficulty breathing, liver damage, kidney failure, and potentially death.

123.   Due to the risk of physical injury caused by the negligence and/or gross negligence of the Defendants, Plaintiff and the Class suffered severe mental and/or emotional harm, including, but not limited to fear, grief, anxiety, shock, and humiliation stemming from the danger of contracting COVID-19 themselves. Plaintiff and the Class were forced to suffer additional harm including, but not limited to fear, grief, anxiety,

shock, and humiliation stemming from witnessing the danger to their family members and fellow passengers of contracting COVID-19. This fear, grief, anxiety, shock, and humiliation in turn had physical manifestations, including, but not limited to insomnia, depression, and anxiety.

124.   The injuries and damages are permanent or continuing in nature. As a result of being trapped for weeks on a vessel teeming with a deadly virus, Plaintiff and the Class will continue to suffer and require medical services not part of the effects of daily life.

125.   As a result, the Plaintiff and the Class are entitled to damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

126.   Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

127.   Plaintiff O'Neill brings this claim on her own behalf and on behalf of each member of the Class described above.

128.   Defendants knew or should have known that there was a heightened risk of a deadly outbreak of COVID-19 on cruise ships given: the state of the global pandemic; guidelines, protocols, and recommendations from public health experts and the cruise industry; and its own experience with COVID-19 outbreaks on the Diamond Princess and the Grand Princess.

129.   Given its knowledge and firsthand experience, Defendants' failure to have effective measures to medically screen for, examine, or treat COVID-19 symptoms was extreme and outrageous conduct.

130.   Given its knowledge and firsthand experience, Defendants' failure to have effective procedures to clean, sanitize, or disinfect the ship in case of viral contagion was extreme and outrageous conduct.

131.   Given its knowledge and firsthand experience, Defendants' failure to have an emergency plan for containing the spread of the virus and/or for disembarking either infected or uninfected passengers or crew in case of viral contagion was extreme and outrageous conduct.

132.   The Defendants' extreme and outrageous conduct had already sickened and even killed passengers on not one but two of its other ships before the Coral Princess set sail. To continue business as usual, and even deny a refund to passengers who wanted to postpone or cancel their trip in light of the spread of COVID-19, was to act with reckless disregard of Plaintiff and the Class and the probability that Plaintiff and the Class would suffer severe emotional distress.

133.   As a direct and proximate result of Defendants' intentional and reckless conduct, Plaintiff and the Class suffered severe or extreme emotional distress including but not limited to fear, grief, anxiety, shock, and humiliation.

134.   The injuries and damages are permanent or continuing in nature. As a result of being trapped for weeks on a vessel teeming with a deadly virus, Plaintiff and the

Class will continue to suffer and require medical services not part of the effects of daily life.

135.   As a result, the Plaintiff and the Class are entitled to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, seeks for judgment against Defendants, and each of them, as follows:

1. An order certifying the proposed Class pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3), designating Plaintiff as a named representative of the Class, and appointing the undersigned attorneys as Class Counsel under Fed. R. Civ. P. 23(g);

2. An order providing the following injunctive relief to promote the health and safety of current and future cruise passengers:

   a. Requiring Defendants to provide truthful, publicly available, and real-time information in an online dashboard (similar to those provided by state departments of health) to passengers and crew on all of Defendants' affiliated ships:

      i. The dashboard shall provide all material information relating to the health and safety of passengers and crew, including, but not limited to COVID-19, norovirus, or other viral cases and exposure. This data shall be provided two months before a cruise, updated during the

cruise, and updated for two months after the conclusion of any sailing in the event passengers are diagnosed following disembarkation;

    ii.  In the event of one or more confirmed COVID-19, norovirus, or other viral cases or exposure during a cruise, passengers and crew shall be promptly notified in writing regarding the material facts of the diagnosis or exposure, including, but not limited to data to allow for reasonable contact tracing.

   b.  Requiring Defendants to implement testing, facial masking, physical distancing, disinfecting, and sanitizing protocols and to adhere to all WHO, CDC, and other applicable health and safety guidelines.

   c.  Requiring Defendants to promptly advise, quarantine, and disembark passengers as soon as Defendants become aware of COVID-19, norovirus, or other viral cases and exposure.

   d.  Requiring Defendants to terminate cruises and to provide refunds and safe, prompt returns to passengers as soon as they become unreasonably dangerous.

3.  An award of damages including, but not limited to compensatory damages for Plaintiff's injuries, including physical and emotional pain and suffering, financial damages, and any other damages allowed by law, in an amount to be proven at trial;

4. An award of the costs of Plaintiff's and the Class's ongoing medical and diagnostic treatment required to diagnose, prevent, and/or treat current or future mental and physical injuries related to Plaintiff's and Class Members' contraction of and exposure to COVID-19;

5. An award of attorneys' fees and costs, as allowed by law;

6. An award of pre-judgment and post-judgment interest, as provided by law;

7. Leave to amend this Complaint and other Plaintiff's pleadings to conform to the evidence produced at trial; and

8. For such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims and of all issues so triable.

DATED this 13th day of July, 2020.

**KELLER ROHRBACK L.L.P.**

By _s/ Alison E. Chase_

Alison E. Chase (SBN 226976)
achase@kellerrohrback.com
801 Garden Street, Suite 301
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Gretchen Freeman Cappio (*pro hac vice* forthcoming)
gcappio@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900, Fax (206) 623-3384

***Attorneys for Plaintiff***